75 F.Supp.2d 982 (1999)
UNITED STATES of America, Plaintiff,
v.
FINDETT CORPORATION, et al., Defendants.
No. 4:97CV1557 CDP.
United States District Court, E.D. Missouri, Eastern Division.
September 15, 1999.
*983 Edward L. Dowd, Jr., Maria C. Sanchez, Office of U.S. Atty., St. Louis, MO, Baerbel E. Schiller, U.S. E.P.A., Kansas City, KS, Daniel S. Jacobs, U.S. Dept. of Justice, Environmental Enforcement Section, Washington, DC, for U.S.
Steven W. Koslovsky, Eugene P. Schmittgens, Jr., Ziercher and Hocker, Clayton, MO, for Defendant Findett Corp.
Julie Emmerich O'Keefe, Emmerich Law Offices, St. Louis, MO, for Defendant ACF Industries, Inc.
William J. Denton, Jennifer Charno Nelson, Lathrop anf Gage, Kansas City, MO, Thomas D. Brown, Computer Sales Intern., Inc., St. Louis, MO, for Defendant General Motors Corp.
Steven L. Leifer, Baker and Botts, Washington, DC, for Defendant Goodyear Tire and Rubber Co.
Joseph G. Nassif, Stacy L. Stater, Thomas Coburn, St. Louis, MO, for Defendants Mallinckrodt Chemical, Inc., Monsanto Co.
Robert J. Wagner, Thomas Coburn, St. Louis, MO, William Stewart, Stewart Law Office, St. Louis, MO, for Defendant Cadmus Corp.
Edwin L. Noel, Jefferson T. McPherson, Armstrong Teasdale, LLP, St Louis, MO, for Defendant Milton Tegethoff.

MEMORANDUM AND ORDER
PERRY, District Judge.
In this civil action, brought under § 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), as amended by the Superfund Amendments and Reauthorization Act of 1986, plaintiff the United States of America seeks to recover response costs that it *984 claims to have incurred, and will incur, in connection with a hazardous waste site located in St. Charles, Missouri. Currently before the Court are the following motions: (1) the government's motion for partial summary judgment on liability against defendant Findett Corporation, (2) the government's motion for partial summary judgment on response costs against Findett, (3) Findett's cross-motion for partial summary judgment on response costs, and (4) Findett's motion for sanctions. All the motions are fully briefed. For the reasons set forth below, the Court will grant the government's motions and deny Findett's motions.

I. Factual Background

The hazardous waste site in question is known as the Findett/Hayford Bridge Site. The Site consists of three parcels of land: property currently owned by defendant Findett Corporation, property formerly owned by Findett and now owned by the Cadmus Corporation (also a defendant here), and property immediately south of the land occupied by Cadmus.
Findett was incorporated in 1962 under the name Findett Service Company, and changed its name to Findett Corporation in 1974. From 1962 through at least 1974, Findett was engaged in the business of recycling and recovering manufacturing fluids, such as heat transfer fluids, hydraulic fluids, and solvents. Some of those fluids contained polychlorinated biphenyls ("PCBs"), which are now known to be hazardous. Findett disposed of some of the waste generated by its operation, including waste containing PCBs, in an open pit or "quench pond" located on its property. Soil analysis shows that the Findett Site is contaminated with PCBs and volatile organic compounds ("VOCs").
EPA's involvement with the Site began in the early 1980's. After EPA's initial investigations indicated the existence of contamination at the Site, the agency conducted further investigations, including an investigation to identify parties potentially responsible for the contamination, and a remedial investigation to more fully define the nature and extent of the contamination. EPA also conducted a feasibility study in which it evaluated alternatives to remediate the contamination.
On May 14, 1990, the government and Findett entered into a consent decree in United States v. Findett Corp., No. 90-0417-C-61, an action also brought in this district. Under the terms of that decree, Findett agreed to perform certain remedial actions, including installing several ground water extraction wells, treating ground water using "air stripping," discharging treated ground water, and removing contaminated soil. The consent decree, by its terms, did not operate as a determination of liability with respect to Findett, and did not prohibit the government from bringing an action based on Findett's liability for remedial action for matters not addressed in the decree. Since the entry of the consent decree, EPA has reviewed and overseen the work performed by Findett under the decree, including reviewing design documents, inspecting field work, and monitoring ground water.
Findett states that it ceased its recycling operations in 1976, and that in 1994, it underwent a "major" transformation following the purchase of a 100% ownership interest by Manuel Joaquim. At the time he made that acquisition, Joaquim already owned 3,400 of the company's shares, which he had purchased in 1990.
The government initiated this lawsuit on July 25, 1997. In its complaint, the government named a total of eight defendants, including Findett. The other seven defendants are: ACF Industries, Inc., General Motors Corporation, the Goodyear Tire and Rubber Company, Mallinckrodt Chemical, Inc., Monsanto Company, Cadmus, and Milton Tegethoff. As mentioned above, the government is seeking to recover all of the response costs that it claims to have incurred, and that it will incur, in connection with the Site. Given that the government's involvement with the Site has been quite lengthy, some of those costs *985 date as far back as 1980. The government asserts that through June 30, 1998, the costs, including interest, total $3,293,909.

II. Discussion

In determining whether summary judgment should issue pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court must view the facts, and the inferences from those facts, in the light most favorable to the non-moving party. The moving party bears the burden of both establishing the absence of a genuine issue of material fact and showing that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, however, the non-moving party may not rest on the allegations in its pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). If the non-moving party bears the burden of proof at trial, summary judgment is warranted if the non-movant is unable to make a showing sufficient to establish the existence of an element essential to its case. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990).

A. The Government's Motion for Partial Summary Judgment as to Liability
The Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., was enacted in 1980 "in response to the serious environmental and health risks posed by industrial pollution." United States v. Bestfoods, 524 U.S. 51, 118 S.Ct. 1876, 1881, 141 L.Ed.2d 43 (1998). CERCLA gives the Environmental Protection Agency ("EPA") "broad authority to direct clean-up operations prior to a final judicial determination of the rights and liabilities of the parties affected." United States v. Dico, Inc., 136 F.3d 572, 574 (8th Cir.1998) (internal quotation marks omitted). The statute authorizes the EPA to bring an action in a federal district court to recover from responsible parties the removal and remediation costs that the government has incurred in connection with responding to the release or threatened release of hazardous substances from disposal or treatment facilities or sites. Id. (citing 42 U.S.C. § 9607(a)).
In an action brought by the government against a private party, the key statutory section is 42 U.S.C. § 9607, which sets forth "the scope of the liabilities that may be imposed on private parties and the defenses that they may assert." Key Tronic Corp. v. United States, 511 U.S. 809, 814, 114 S.Ct. 1960, 128 L.Ed.2d 797 (1994); 42 U.S.C. § 9607. The statute identifies four classes of "responsible persons" liable for response costs:
(1) the owner and operator of a vessel or a facility,
(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and
(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.
42 U.S.C. § 9607(a)(1)-(4). The statute further provides that "notwithstanding any other provision or rule of law," a "responsible person" shall be liable in an action *986 brought by the government for "all costs of removal or remedial action ... not inconsistent with the national contingency plan ["NCP"],"[1] including interest thereon. 42 U.S.C. § 9607(a). Thus, to establish liability under § 9607(a), the government must show (1) that Findett is a "responsible person" within the meaning of the statute, (2) that the Findett Site is a "facility," (3) that there has been a release or threatened release of a hazardous substance or substances from the Site, and (4) that the government has incurred response costs as a result. See United States v. Aceto Agric. Chems. Corp., 872 F.2d 1373, 1378-79 (8th Cir.1989).[2]
CERCLA is a strict liability statute, Control Data Corp. v. S.C.S.C. Corp., 53 F.3d 930, 936 (8th Cir.1995), with only a limited number of statutorily-defined defenses available. In an action brought under § 9607, an otherwise liable party may avoid liability only if it can establish by a preponderance that the release or threatened release of the hazardous substance or substances and the resulting damages were caused "solely" by one or more of the following: an act of God, an act of war, or, subject to certain limitations, an act or omission of a third party. Section 9607(b); see B.F. Goodrich Co. v. Murtha, 958 F.2d 1192, 1198 (2d Cir.1992). ("Potential affirmative defenses are limited to those listed in § 9607(b)").
Findett concedes in its brief in opposition to the government's summary judgment motion that the government has established "all the elements necessary to present a prima facie case of liability under CERCLA against Findett." Findett contends, however, that genuine issues of material fact remain as to the following three issues: (1) whether the government's claim is barred by the statute of limitations, (2) whether a third party other than Findett is liable under § 9607(b), and (3) whether the government has already recovered costs in excess of those that it has incurred consistent with the NCP. The record indicates that the parties have more fully developed the third issue in their briefs on the government's motion for partial summary judgment on costs, and the Court will therefore address the issue in that section of this opinion.
Findett's first argument is that this action is barred by the six year statute of limitations found in 42 U.S.C. § 9613(g)(2). That subsection provides that in the case of a remedial treatment action, an "initial action" for the recovery of the costs referred to in § 9607 must be brought "within 6 years after initiation of physical on-site construction of the remedial action." 42 U.S.C. § 9613(g)(2). The statute further provides that in any such initial action, "the court shall enter a declaratory judgment on liability for response costs or *987 damages that will be binding on any subsequent action or actions to recover further response costs or damages." Id. Finally, the statute provides that a "subsequent" action or actions under § 9607 "may be maintained at any time during the response action," or "must be commenced no later than 3 years after the date of completion of all response action." Id.
The parties agree that if the instant action is a "subsequent" action within the meaning of the statute, it is not time-barred, as response action at the Site is ongoing. Findett, however, contends that this action is, in fact, an "initial" action. The government disagrees, arguing that the case that ended in the entry of the May 14, 1990, consent decree was the initial action, and that this action is therefore a subsequent action. Findett responds by pointing out that no declaratory judgment as to liability was entered in the earlier case. Findett argues that under the terms of § 9613(g)(2), an action cannot be an "initial" action if no such judgment is entered.
Two courts of appeals  although not the Eighth Circuit, which has never addressed the issue  have described § 9613(g)(2)'s language as rendering the entry of a declaratory judgment "mandatory." See Kelley v. E.I. DuPont de Nemours and Co., 17 F.3d 836, 844 (6th Cir.1994); Dent v. Beazer Materials and Servs., Inc., 156 F.3d 523, 531 (4th Cir.1998) (quoting Kelley, 17 F.3d at 844). However, neither was considering the question presented here. In Kelley, for example, the defendants argued to the Sixth Circuit that the district court erred in granting declaratory relief to cover future clean-up costs in favor of the State of Michigan, contending that such costs were speculative. See 17 F.3d at 844. Similarly, in Dent, the Fourth Circuit was faced with the issue of whether the district court erred in entering a declaratory judgment as to future response costs on the basis of evidence adduced prior to completion of administrative proceedings. See 156 F.3d at 531.
The only court of appeals to squarely confront the argument raised by Findett here is the Seventh Circuit, which rejected it. United States v. Navistar Int'l Trans. Corp., 152 F.3d 702, 708-10 (7th Cir.1998). That court found that the purpose of § 9613(g)(2) was simply to avoid the need to relitigate liability questions,[3] and concluded that there was "nothing to indicate that a declaratory judgment is the only permissible means to resolve an `action for recovery of the costs referred to in section 9607.'" Id. at 709-10 (quoting § 9613(g)(2)). As support for its position, the court pointed to legislative history plainly indicating that the sole purpose of the section's declaratory judgment language is "`to conserve judicial time and resources,'" id. at 709 (quoting H.R.Rep. No. 99-253, pt. 3, at 21 (1985), reprinted in 1986 U.S.C.C.A.N. 3038, 3034).
While the Court recognizes that "shall" generally means "must," cf. Gutierrez de Martinez v. Lamagno, 515 U.S. 417, 432 n. 9, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995) (observing that "legal writers sometimes use, or misuse, `shall' to mean `should,' `will,' or even `may'"), it believes that the Seventh Circuit has the better argument with respect to § 9613(g)(2). First of all, the Court is cognizant of the general principle that statutes of limitations are to be construed in favor of the government. See, e.g., United States v. Telluride Co., 146 F.3d 1241, 1248 (10th Cir.1998). More importantly, however, the Court believes that reading § 9613(g)(2) as mandating the entry of a declaratory judgment would run counter to CERCLA's fundamental purposes, i.e., encouraging quick responses to hazardous waste sites and placing the costs therefor on those responsible for the hazardous conditions. See Control Data Corp., 53 F.3d at 936. Findett's suggested reading of the statute *988 would have the perverse effect of promoting litigation by discouraging the government and potentially "responsible parties" from entering into consent decrees. Because the government would insist, under Findett's reading of § 9613(g)(2), on obtaining a declaratory judgment of liability, a potentially "responsible party" otherwise amenable to entering into such a decree might well devote resources to litigation that would be better spent on clean-up. The Court finds that the government's suit is a subsequent action within the meaning of § 9613(g)(2), and, therefore, is not time-barred.
Even if the Court's interpretation of § 9613(g)(2) were incorrect and the six year statute of limitation were to apply, the Court agrees with the government that this action would still be timely. Under a tolling agreement executed by Findett on October 7, 1996, the statute of limitations was tolled during the period October 21, 1996, through October 21, 1997. The government contends that the unrebutted evidence shows that no "physical on-site construction of the remedial action" took place prior to October 22, 1990.[4] Findett disagrees, contending that "a number of activities, consistent with the permanent remedies, were at the site prior to October 22, 1990." To support its claims, Findett refers the Court to the depositions of three individuals. However, Findett has not provided the Court with those depositions[5] or cited the particular pages on which the relevant statements appear.[6] Findett has thus failed to "set forth specific facts showing that there is a genuine issue [on the statute of limitations question] for trial." Rule 56(e), Fed.R.Civ.P. Moreover, the three activities (namely, conducting topographic surveys, "laying out" a concrete pad "that was to be constructed," and collecting deepwater ground samples) that Findett alleges took place prior to October 22, 1990, could not possibly constitute "physical on-site construction." See California v. Hyampom Lumber Co., 903 F.Supp. 1389 (E.D.Cal.1995) (setting forth a four part test for determining when a given event constitutes physical, on-site construction, and holding that the installation of water and electrical hardware met that test); United States v. Akzo Nobel Coatings, Inc., 990 F.Supp. 897, 905-06 (explaining that Hyampom Lumber's test establishes a floor, not a ceiling, and holding that the triggering event must represent "an integral step in the implementation of the permanent remedy"); cf. Navistar, 152 F.3d at 705, 713 (placement of the first "lift" of clay to build permanent clay cap on landfill triggered statute).
Findett also seeks to invoke each of the three affirmative defenses listed in § 9607(b). First, Findett argues that when its stock was purchased by Manuel Joaquim in 1994, its responsibility for its past releases of hazardous substances ceased to exist. Second, Findett argues that its neighbor Cadmus was "a source of the hazardous substances" found on Cadmus' property. Third, Findett contends that "there are facts to show that flooding may have contributed to the contamination of the Findett Site by transferring the hazardous materials from Cadmus." (Emphasis in Findett's brief.)
Findett points to no authority for the proposition that a corporation's potential CERCLA liability ceases when its *989 stock is sold to an individual who, at the time of purchase, is aware of contamination on property owned by the corporation. The cases cited by Findett are inapposite. They deal with the issue of when CERCLA liability can be imposed on a corporate successor, which is not the issue here. See Black's Law Dictionary 1431 (6th ed.1990) (defining "successor" with reference to corporations to mean "another corporation which, through amalgamation, consolidation, or other legal succession, becomes invested with rights and assumes burdens of first corporation"). For example, two of the cases relied on by Findett, B.F. Goodrich Co. v. Murtha, 840 F.Supp. 180, 191 (D.Conn.1993); and United States v. Petersen Sand & Gravel, Inc., 806 F.Supp. 1346, 1350 (N.D.Ill.1992), involved the issue of whether a corporation succeeds to the statutory liabilities of a predecessor sole proprietor. In the only Eighth Circuit case that defendant cites, United States v. Mexico Feed & Seed Co., 980 F.2d 478 (8th Cir.1992), the court was faced with the question of whether a corporation that purchased the assets of a waste oil hauling company was liable under CERCLA for clean-up of the acquired company's leaking oil tanks. The court of appeals held in the negative, reasoning that the corporation was a larger, preexisting competitor of the hauling company, and that it purchased the company's assets without knowledge of the tanks and prior to the company's being identified as a potentially responsible party under CERCLA. Id. at 489. Here, Findett was not acquired by an existing corporation; rather, its stock was purchased by an individual who knew of its environmental liabilities.
Findett's arguments that Cadmus caused some of the contamination at the Site and that flooding "most likely impacted the distribution of surface contaminants" at the Site fall of their own force. As explained above, to avoid liability under § 9607, Findett must prove by a preponderance that the release was caused "solely" by an act of God, an act of war, or the act or omission of a third party. 42 U.S.C. § 9607(b). Findett does not contend that its actions played no part in the release of hazardous substances at the Site.
In sum, the Court finds that this action is not barred by the statute of limitations, and that Findett has failed to raise a genuine issue of material fact with regard to the three affirmative defenses available under 42 U.S.C. § 9607(b). The government is entitled to summary judgment on liability.

B. The Government's Motion for Partial Summary Judgment on Costs
Following the filing of its motion for partial summary judgment on liability, the government filed another motion for partial summary judgment, this one on response costs. In that latter motion, the government seeks reimbursement from Findett of $3,293,909 in response costs that it claims to have incurred in connection with the Site. The three million dollar figure consists of (1) the payroll and travel costs of EPA personnel, (2) EPA indirect costs (i.e., costs which, while not attributable to a specific Superfund site, are necessary to operate the Superfund program, and which are allocated to a site based on the number of EPA employee hours charged to that site), (3) costs of numerous contracts entered into by EPA with contractors for, inter alia, analyzing environmental samples collected at the Site, quality assurance and quality control of analytical data for the Site, remedial investigation and planning activities, and collection and monitoring of ground water, (4) costs of agreements entered into between EPA and the Missouri Department of Human Resources under which the state agency rendered management and technical assistance with remedial investigations and performed various oversight work, (5) prejudgment interest that began accruing on September 27, 1996, the date of EPA's demand letter to potentially responsible parties seeking past and future costs, and (6) Department of Justice employee *990 payroll and travel costs and indirect costs.
As mentioned above, CERCLA provides that the federal government, a state, or an Indian tribe can recover "all costs of removal or remedial action ... not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(A). In an action brought by any one of those three parties, the burden of proof as to inconsistency is on the defendant. United States v. Northeastern Pharm. & Chem. Co., 810 F.2d 726, 747 (8th Cir.1986) ("NEPACCO"), cert. denied, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); Minnesota v. Kalman W. Abrams Metals, Inc., 155 F.3d 1019, 1025 (8th Cir.1998); United States v. Chapman, 146 F.3d 1166, 1171 (9th Cir. 1998). A defendant "must demonstrate that the government's response action giving rise to the particular cost is inconsistent with the NCP." United States v. Hardage, 982 F.2d 1436, 1442 (10th Cir. 1992) (citing NEPACCO, 810 F.2d at 748), cert. denied, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993); United States v. R.W. Meyer, Inc., 889 F.2d 1497, 1508 (6th Cir.1989), cert. denied, 494 U.S. 1057, 110 S.Ct. 1527, 108 L.Ed.2d 767 (1990).
Findett argues that the government is not entitled to the bulk of its claimed response costs because it has not provided Findett with documents required by an EPA directive and by the NCP. The Court considers those arguments in turn.
Findett and its expert contend that in order to properly document its costs, the government must follow the guidelines set forth in a document known as Resource Management Directives 2550D or "Financial Management of the Superfund Program" ("EPA Directive 2550D") which was issued on July 25, 1988. According to chapter one of EPA Directive 2550D, the document's purpose is to explain the financial management and accounting policies "with which all EPA offices must comply" to meet Superfund's accounting requirements.
The problem with Findett's argument invoking EPA Directive 2550D is that "CERCLA clearly states that `notwithstanding any other provision or rule of law,' a private party will reimburse the United States for all costs incurred." United States v. Chromalloy American Corp., 158 F.3d 345 (5th Cir.1998); see 42 U.S.C. § 9607(a). The Supreme Court has observed that in construing statutes, the use of a "notwithstanding" clause "clearly signals the drafter's intention that the provisions of the `notwithstanding' section override conflicting provisions of any other section." Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993).
In Chromalloy, the Fifth Circuit considered  and rejected  a contention quite similar to that raised by Findett here. In that case, Sequa Corporation, one of the defendants, challenged the district court's failure to find that oversight costs incurred by the EPA were incurred in violation of the Economy Act of 1932. Sequa argued that the EPA failed to follow the Economy Act's provisions in entering into an agreement with the Bureau of Reclamation ("BOR") under which BOR agreed to assist the EPA in overseeing Sequa's clean-up efforts, and pointed out that the EPA-BOR agreement specifically identified the Economy Act as the statutory authority for the transfer of funds and for the projected oversight activities. See 158 F.3d at 350. The Fifth Circuit disagreed, holding that the EPA's failure to follow the Economy Act did not preclude imposing oversight costs on Sequa. In doing so, the court found § 9607(a)'s "notwithstanding" language "explicit," and stated that it "must be given effect." Id. at 351; see also Town of Munster v. Sherwin-Williams Co., 27 F.3d 1268, 1271 (7th Cir.1994) (describing § 9607(a)'s language as "clear and unambiguous"). Several district courts have reached the same conclusion. See, e.g., United States v. Wade, 577 F.Supp. 1326, 1336 (E.D.Pa.1983) (explaining that § 9607(a)'s "clear language" refuted defendants' attempt to link liability under § 9607 to restrictions placed on Superfund *991 expenditures in § 9604); United States v. Reilly Tar & Chem. Corp., 546 F.Supp. 1100, 1117-18 (D.Minn.1982) (citing § 9607(a)'s "notwithstanding" language in rejecting defendant's contention that the existence of a cooperative agreement between the state and federal government  which § 9604(c)(3) requires before the President can take any remedial actions  is a prerequisite to liability under § 9607); see also United States v. Hardage, 733 F.Supp. 1424, 1435 (W.D.Okla. 1989) (finding that defendant provided no authority for its contention "that a fact dispute exists as to whether certain costs were incurred in compliance with federal procurement laws and regulations"), aff'd in relevant part, 982 F.2d 1436 (10th Cir. 1992), cert. denied, 510 U.S. 913, 114 S.Ct. 300, 126 L.Ed.2d 248 (1993). The Court finds that § 9607(a)'s unambiguous language leads to the conclusion that even assuming the government failed to comply with EPA Directive 2550D, that failure does not bar its recovery in this action.
Findett's other argument is that the government has not complied with the documentation requirements of the NCP itself. However, as Findett's own expert conceded at his deposition, the NCP simply does not contain any specific standards concerning the documentation of costs. Rather, it provides as follows:
During all phases of response, the lead agency shall complete and maintain documentation to support all actions taken under the NCP and to form the basis for cost recovery. In general, documentation shall be sufficient to provide the source and circumstances of the release, the identity of responsible parties, the response action taken, accurate accounting of federal state or private party costs incurred for response actions, and impacts and potential impacts to the public health and welfare and the environment.
40 C.F.R. § 300.160(a)(1) (1998) (emphasis added).[7] The regulation does not define "accurate accounting" and does not elaborate on what is meant by "sufficient" documentation.
In this case, the government has adduced a significant amount of evidentiary support for its motion for partial summary judgment on response costs. For example, it has provided itemized cost summary reports of its payroll costs. Those reports include the names of employees who did Site-related work, the year and the pay period in which they did that work, the hours that they worked, and the corresponding payroll amounts. The government has also provided cost summaries of Site-related travel costs. The summaries list the employee who traveled, the travel voucher number, the cost of the travel, and the Treasury schedule confirming payment of that cost. With respect to the EPA contractors who worked on the Site, the government has provided contract summaries listing the contractor, contract number, and total contract costs. The summaries set forth the voucher and Treasury schedule numbers supporting those costs and confirming payment thereof. The government has further provided affidavits of all of the remedial project managers ("RPMs") who worked on the Findett Site between May 1983 to the present. In those affidavits, the RPMs reference specific contracts and contractors, and attest that they, inter alia, oversaw the work done by those contractors on the Site, reviewed monthly work assignment status reports submitted by the contractors, and monitored the progress of the contractors on the Site through telephone conversations, face-to-face meetings, and on-site inspections.
The type of documentation submitted by the government in this case has *992 been found acceptable by several courts of appeals. In United States v. Chapman, 146 F.3d 1166 (9th Cir.1998), for example, the Ninth Circuit found that the EPA adequately documented the costs incurred in its response action with "detailed cost summaries" and "declarations from EPA staff, attorneys, accountants, and supervisors" attesting to the work they performed and the time that they spent on the site. Id. at 1171. Likewise, in Chromalloy, the Fifth Circuit upheld the district court's grant of summary judgment in favor of the government, concluding that the EPA's "detailed cost summaries" provided an "adequate" basis to find the government's oversight costs reasonable and necessary. 158 F.3d at 352. Finally, in Hardage, the Tenth Circuit agreed that documentation consisting of affidavits of EPA and Department of Justice employees charged with accumulating the response cost data, coupled with supporting "summaries of cost data," were sufficient to establish a prima facie case that the government was entitled to the response costs it had incurred. 982 F.2d at 1442-43. The Court finds the government has adequately documented its response costs in this case as well.
Although Findett attacks the government's costs as inadequately documented, the Court disagrees. As just explained, the type of detailed cost summaries submitted by the government here have routinely been found adequate to support its cost claims in other cases. Furthermore, even if Findett were correct in its contention that more than that documentation is required, the Court believes the government has provided more. As its chief example of a cost sought by the government which, it alleges, is insufficiently supported, Findett points to CH2M Hill contract number XX-XX-XXXX, under which EPA claims to have incurred $869,779.04 in response costs. Findett contends in its brief that its accounting expert, Dale Jensen, "analyzed the documentation that was produced to Findett and the other defendants by the EPA and found that there were no invoices, progress reports, treasury schedules, or work assignments that related to the work done at the Findett Site." Leaving aside the fact that Jensen acknowledged at his deposition that he never personally reviewed the government's document production, the Court notes that Findett's contention is squarely refuted by Attachment C to Jensen's expert report, which indicates that the government in fact provided for contract number XX-XX-XXXX the following: site-specific invoices indicating costs by cost type, invoice approval forms signed by the Site's RPM or other responsible site-specific EPA employee, proof of payment invoices (i.e., Treasury schedules), and monthly progress reports.[8]
Findett's challenge to the government's annual or historical allocation cost reports also fails. Findett claims that the government provided only a "conclusory and self serving certification" and a "statement by an EPA official" in support of its allocation cost reports. The record is to the contrary. Through the annual allocation process, a contractor who works on multiple sites under a single contract with the EPA allocates to a given site the costs of non-site-specific activities that are nevertheless necessary to support its site-specific response actions (e.g., the rent on a regional office from which a contractor oversees work at several sites). Allocation to a particular site is made on the basis of the *993 ratio of that site's direct site costs to the total cost of all site and non-site activities. By totaling the site-specific costs with the allocated non-site specific costs, the government endeavors to develop the real total cost of the site work performed by the contractor. The government offered a thorough and detailed explanation of the allocation process, and the Court concludes that inclusion of the allocated costs is proper. CERCLA "contemplates that those responsible for hazardous waste at each site must bear the full cost of cleanup actions and that those costs necessarily include both direct costs and a proportionate share of indirect costs attributable to each site." R.W. Meyer, Inc., 889 F.2d at 1504. For all of the above reasons, the Court finds that Findett has failed to raise a dispute of material fact as to whether the government is entitled to the $3,293,909 that it incurred in response actions at the Findett Site.

C. Findett's Cross-Motion for Summary Judgment on Response Costs
After the government filed its motion for partial summary judgment on response costs, Findett filed a cross-motion for summary judgment with respect to the same issue. In that motion, Findett argues, as it did in its response to the government's motion, that because the government failed to comply with EPA Directive 2550D, it is not entitled to recover its response costs as a matter of law. Findett further asserts that even assuming the government could establish its costs, summary judgment in Findett's favor is nevertheless warranted because the company lacks the ability to pay any judgment in excess of $601,550. In the preceding section, the Court considered fully and rejected Findett's argument with respect to the EPA directive. Accordingly, in this section, it will address only Findett's ability to pay argument.
In support of its contention that the Court should grant summary judgment in its favor based on inability to pay, Findett cites a September 30, 1997, memorandum entitled "General Policy on Superfund Ability to Pay Determinations" from the director of EPA's Office of Site Remediation Enforcement. By its terms, that document provides "a general policy framework" for settlements in which a party's financial ability to pay is a "significant consideration." The policy's purpose is "to provide guidance" to EPA enforcement personnel, affected parties, and the public on the information that EPA will look at and the steps that it will follow in evaluating a potential settlement based on ability to pay.
Findett's contention is flawed in several respects. First, the policy statement that Findett relies on is just that  a policy statement. As such, it does not have the force of law. Even if it had such force, by its terms it relates to settlements, not fully litigated disputes such as this one. As with any defendant in any lawsuit, Findett's ability to pay a judgment is irrelevant to a determination that it is liable for any particular sum. See United States v. Charles George Trucking, Inc., 34 F.3d 1081, 1087 (1st Cir.1994). The Court will deny Findett's motion for partial summary judgment.

III. Findett's Motion for Sanctions
Findett has also moved for sanctions against the government for its alleged failure to comply with Rule 26(a), Fed.R.Civ. P., and the Case Management Order. The grounds of Findett's motion are as follows: On January 15, 1998, after the government made its initial Rule 26(a) disclosures, counsel for defendant General Motors Corporation ("GM") wrote to counsel for the government and stated, "Upon the generator defendants' review of the documents, several types of documents we expected to find in a complete site file appear to be missing." GM's counsel then listed ten categories of documents that she was seeking. The ninth category listed was "annual allocation reports and supporting Site specific invoices and treasury schedules." The government's counsel, Daniel Jacobs, *994 responded to the letter from GM's counsel on January 28, 1998. With respect to that ninth category, Jacobs stated,
The site-specific invoices and treasury schedules are not presently within the custody and control of EPA. The following annual allocation reports are presently within EPA's custody and control and will be produced: (1) Copies of three contracts with final annual allocation rates; (2) Documentation for provisional annual allocation rates for contracts XX-XX-XXXX; 68-W9-0006 and 68-W9-0007.
Jacobs later clarified that "not presently within the custody and control of EPA" meant that EPA "conducted a good faith search for the requested documents in its Region VII offices and did not locate them," and that the searchers had no expectation that the documents would be found in any other EPA office.[9]
On November 16, 1998, the government took the deposition of Dale Jensen, who, as mentioned above, is Findett's expert accountant. At that deposition, Jensen challenged the government's annual allocation costs on the ground that they were not properly documented. On January 28, 1999, after the close of discovery in this case, Jacobs wrote Findett's counsel, and advised that the EPA had just advised him (Jacobs) that it had located "work performed" and "invoice" documentation relating to annual allocation costs in Washington, D.C., and Research Triangle Park, North Carolina. Jacobs advised that it would produce the documents (possibly subject to a protective order to protect confidential business information) at "the earliest practicable time."
In its motion for sanctions, Findett argues that the aforementioned sequence of events leads to the conclusion that the government either "intentionally" misled Findett and the other defendants or failed to timely conduct a good faith search for the requested documents. Findett contends that the Court should sanction the government for its belated production by excluding any evidence in support of its claim for allocation costs[10] and awarding Findett the costs and attorney's fees that it incurred in raising this matter.
Rule 26(a) of the Federal Rules of Civil Procedure requires a party to provide to other parties, inter alia, "a copy of, or a description by category and location of, all documents, data compilations, and tangible things in the possession, custody, or control of the party that are relevant to disputed facts alleged with particularity in the pleadings." Rule 26(a), Fed.R.Civ.P. The rule further provides that a party shall make its initial disclosures "based on the information then reasonably available to it." Id. If, without "substantial justification," a party fails to disclose information required by Rule 26(a), it shall not be permitted to use that information at trial, unless its failure is harmless. Rule 37(c)(1), Fed.R.Civ.P.; see Finley v. Marathon Oil Co., 75 F.3d 1225, 1230 (7th Cir. 1996) ("The sanction of exclusion is ... automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.").
The Court will deny Findett's motion for several reasons. First, it does not comply with Local Rule 3.04(A), which provides, "The Court will not consider any motion relating to discovery and disclosure unless it contains a statement that movant's counsel has conferred in person or by telephone with the opposing counsel in good faith or has made reasonable efforts to do so ...." E.D.Mo. L.R. 3.04(A) (emphasis added). The Court could deny the *995 motion on that basis alone. Second, there is no indication that the government acted in bad faith in making its disclosures, that is, that it failed to turn over relevant documents then "reasonably available" to it. In its Rule 26(a) disclosures, the government produced to defendants sixteen boxes containing 48,725 pages of documents. Included in those documents was the EPA's entire documentary record for the Site and a compilation of all cost documents relating to the Site. Third and finally, the Court believes that while it is true that non-site-specific costs are used to calculate a contractor's annual allocation costs, the question of whether the government is required to produce documentation of those costs as part of its initial disclosures is at least somewhat debatable, especially in light of the fact that courts have routinely held that the government satisfies its evidentiary burden regarding costs through the use of cost summaries and declarations from EPA staff, attorneys, accountants, and supervisors. See Chapman, 146 F.3d at 1171; Chromalloy, 158 F.3d at 352; Hardage, 982 F.2d at 1442-43. In this case, Findett did not join in the January 15, 1998, letter from GM's counsel to the government, and did not make clear its objections with respect to allocation costs until Jensen's deposition (which, as mentioned above, did not take place until mid-November 1998). In its supplemental responses to the government's first set of interrogatories (dated September 16, 1998), Findett merely contended that "a significant amount" of the government's costs had not been properly documented, without elaborating as to which costs it was referring. The Court will deny Findett's motion for sanctions.
Accordingly,
IT IS HEREBY ORDERED that plaintiff the United States of America's motion for partial summary judgment on liability [# 80] is granted.
IT IS FURTHER ORDERED that plaintiff's motion for partial summary judgment on response costs [# 108] is granted, and that defendant Findett Corporation's cross-motion for summary judgment [# 123] is denied.
IT IS FURTHER ORDERED that defendant Findett Corporation's motion for sanctions [# 127] is denied.
A separate judgment in accordance with this memorandum and order is entered this same date.
The parties shall bear their own costs of this action.
NOTES
[1] The purpose of the National Oil and Hazardous Substances Pollution Contingency Plan (often referred to as "the national contingency plan" or "the NCP") is "to provide the organizational structure and procedures for preparing for and responding to discharges of oil and releases of hazardous substances, pollutants, and contaminants." 40 C.F.R. § 300.1.
[2] In a case in which a party other than the federal government, a State, or an Indian tribe seeks to recover its response costs, the relevant statutory subsection provides that the plaintiff must prove that those costs were (a) necessary and (b) consistent with the NCP. See 42 U.S.C. § 9607(a)(4)(B) (making a covered person liable for "any other necessary costs of response" incurred by any person other than the federal government, a State, or an Indian tribe which are "consistent with the national contingency plan"); Washington State Dep't of Trans. v. Washington Natural Gas Co., 59 F.3d 793, 799-800 (9th Cir.1995). In contrast, where the party seeking its response costs is one of the three enumerated parties (i.e., the United States Government, a State, or an Indian tribe), it may recover all of those costs, regardless of necessity, that are "not inconsistent with the national contingency plan." 42 U.S.C. § 9607(a)(4)(B). Because the instant case is one brought by one of the three parties listed in § 9607(a)(4)(B), its costs are presumed to be consistent with the NCP. See Minnesota v. Kalman W. Abrams Metals, Inc., 155 F.3d 1019, 1025 (8th Cir. 1998) (stating that the government "may recover all costs except those that [defendants] prove were inconsistent with the NCP").
[3] The Dent court agreed on this point. See 156 F.3d at 532 ("The purpose of § 113(g)(2) is, in fact, to require that the court's judgment in the first action have a preclusive effect as to liability on all successive actions.").
[4] As mentioned above, such construction is required to trigger the running of the six year limitations period under the statute. See 42 U.S.C. § 9613(g)(2).
[5] The Court notes that the government attached to its reply brief an excerpt from one of the three depositions.
[6] Findett filed its "Memorandum in Opposition to United States' Motion for Partial Summary Judgment on Liability" on December 4, 1998. In footnote one on page three of that memorandum, Findett states that it "will supplement th[e] Memorandum to include the precise page number as soon as Findett receives the deposition transcripts." To date Findett has not filed any additional deposition portions or listing of page numbers with the Court related to this issue.
[7] Older versions of this regulation are not substantively different. See 40 C.F.R. § 300.160(a)(1) (1990) (using same language); 40 C.F.R. 300.69(a) (1985) ("In general, documentation should be sufficient to provide the circumstances of the condition, the identity of responsible parties, accurate accounting of Federal costs incurred, and impacts and potential impacts to the public health, welfare and environment.").
[8] Attachment C also refutes Findett's claims regarding other contracts reviewed by Jensen. For example, the attachment indicates that for contract number 68-W9-0006, a $188,809.53 contract performed by Planning Research Corporation, the government provided site-specific invoices indicating costs by cost-type, invoice approval forms, Treasury schedules evidencing proof of payment, work assignments with descriptions of work to be performed, and monthly progress reports. Similar documentation was provided for a $67,713.17 contract performed by Jacobs Engineering (contract number XX-XX-XXXX), a $40,279.31 contract performed by Alliance/GCA (contract number XX-XX-XXXX), a $48,745.62 contract performed by Ecology & Environment (contract number XX-XX-XXXX), and a $238,823.92 contract (number XX-XX-XXXX) also performed by CH2M Hill.
[9] Region VII consists of the states of Missouri, Iowa, Kansas, and Nebraska. See 40 C.F.R. § 300.105, Fig. 2.
[10] These costs total $335,435.03. In its response to Findett's motion, the government states that based on a recent review of the contractor annual allocation costs, it has concluded that there should be no such costs for one of the contracts, and is therefore willing to stipulate that this $335,435.03 figure should be reduced by $8,525.00. The judgment in this case will be reduced by this amount for a total judgment of $3,285,384.